**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| In re:<br><br>**KINGSBURY CORPORATION,**<br><br>Debtor. | Chapter 11<br><br>Case No. 11-13671 |

**MOTION FOR ORDER: (A) AUTHORIZING THE DEBTOR TO OBTAIN
POST-PETITION FINANCING; (B) GRANTING TO DIAMOND BUSINESS CREDIT,
LLC POST-PETITION SECURITY INTERESTS; (C) AUTHORIZING THE USE OF
CASH COLLATERAL; (D) GRANTING ADEQUATE PROTECTION IN THE FORM
OF REPLACEMENT LIENS; AND (E) SETTING A FINAL HEARING**

Kingsbury Corporation (the "Debtor"), the debtor and debtor-in-possession in the above-captioned chapter 11 case, hereby files this motion (the "Motion") seeking an order: (a) authorizing the Debtor to obtain post-petition financing from Diamond Business Credit, LLC ("Diamond") in the form of an increase in the inventory advance rate with such advance not to exceed $300,000.00, in addition to the Debtor's prepetition revolving line of credit with Diamond, in accordance with the term sheet attached hereto as **Exhibit A** (the "Term Sheet") and the amendments to existing loan and collateral documents referenced therein (the "Amendment") (such financing being referred to herein as the "DIP Financing"); (b) authorizing the Debtor to grant to Diamond post-petition security interests in all of its assets in the same priorities as Diamond enjoyed with respect to all of such assets prepetition (and without priming any other existing liens); (c) authorizing the use of cash collateral post-petition for the purposes set forth in the budget (the "Budget") attached hereto as **Exhibit B**; (d) granting adequate protection to the Lienholders (as defined below) in the form of replacement liens; and (e) prescribing the manner of notice for the final hearing. The relief sought in this Motion is critical to enable the Debtor an opportunity to jumpstart its operations and fund the early stages of its

bankruptcy case. Under the circumstances, the relief is in the best interests of the Debtor's estate and is warranted under the applicable sections of title 11 of the United States Code (the "Bankruptcy Code"), including sections 105 and 364. In further support of this Motion, the Debtor states as follows:

## JURISDICTION, VENUE AND STATUTORY BASIS

1. This Court has jurisdiction to entertain this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The predicates for the relief sought herein are sections 105(a), 363, 364 and 552 of the Bankruptcy Code, Rules 2002 and 4001(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Bankruptcy Rules for the District of New Hampshire (the "Local Rules").

## BACKGROUND

*A.  The Debtor's Operations*

2. The Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on September 30, 2011 (the "Petition Date"). The Debtor will continue to operate its businesses as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been sought or appointed in this case, and no committees have been appointed as of the date of this Motion.

3. The Debtor's primary secured creditors are TD Bank, N.A. ("TD Bank"), Utica Leaseco, LLC ("Utica"), the United States Small Business Administration (the "SBA") and Diamond. Pursuant to an intercreditor agreement among the lenders (other than the SBA), TD Bank has a first position on the Debtor's real estate, Utica is in first position on certain designated machinery and equipment and Diamond has a first priority lien on inventory and

receivables, as well as intellectual property, general intangibles and all personal property not subject to the first lien of Utica. The SBA is secured by a junior lien on the real estate. Diamond has subordinate security interests in the real estate (behind TD Bank and the SBA) and in the machinery and equipment collateral of Utica, and the value of Diamond's interest in the real estate is an element of Diamond's borrowing base with the Debtor.

4. The Utica debt arises out of a March 14, 2008 Loan and Security Agreement pursuant to which Utica advanced $1,525,000 to the Debtor. On July 8, 2011, Utica sent the Debtor a notice of default alleging that the Debtor was in default under the terms of the loan agreement and accelerating the debt so that principal, interest and late charges in the amount of $1,257,819.14 allegedly became due on July 14, 2011.

5. On or about July 13, 2011, Utica and the Debtor entered into a Surrender and Forbearance Agreement, an Auction Agreement and an Occupancy Agreement (collectively, the "<u>Surrender and Auction Agreements</u>"). Under the terms of the Surrender and Forbearance Agreement, the Debtor allegedly surrendered to Utica its interest in all of the machinery and equipment on which Utica has a first priority lien. The Surrender and Forbearance Agreement also proposed an alternative payment schedule on the promissory note underlying the loan agreement.

6. Provided the Debtor made the first five payments on schedule, the collateral allegedly surrendered to Utica under the Surrender and Forbearance Agreement would be returned to the Debtor. If, however, the Debtor failed to make the scheduled payments, the loan agreement would be terminated, the Debtor would be forced to cease operations and the machinery and equipment would be sold at auction pursuant to the terms of the Surrender and Auction Agreements.

7.      In spite of efforts to increase cash flow, obtain additional financing, refinancing or an equity infusion, the Debtor was unable to meet the payment schedule set forth in the Surrender and Forbearance Agreement. As of the Petition Date, the Debtor had suspended operations and Maynards Industries (1991) Inc. (the "Auctioneer"), the Auctioneer retained in accordance with the Surrender and Forbearance Agreements, was on site to inventory and prepare machinery and equipment for sale at an auction scheduled to take place on or about October 11, 2011. However, the Debtor, with the funds to be provided by the DIP Financing, has the capacity to operate and to reorganize for the benefit of all of its creditors and stakeholders.

8.      Pre-petition, the Debtor and its affiliates, Donson Group, Ltd. and Ventura Industries, LLC, entered into an Intellectual Property License Agreement with Chrysler Group, LLC ("Chrysler"), a major customer of the Debtor, pursuant to which the Debtor granted Chrysler a license in certain proprietary information and intellectual property rights of the Debtor with respect to certain machinery and equipment sold to Chrysler by the Debtor. In consideration for the license, Chrysler paid $300,000 to the Debtor which was in turn paid to Diamond, the first lienholder in intellectual property, to facilitate the DIP Financing and to jumpstart operations and fund its chapter 11 case.[1]

9.      The Debtor intends to restructure its existing debt and reorganize its operations so it can emerge from chapter 11 as an operating entity. As part of that reorganization, the Debtor may sell certain assets in an effort to streamline its operations and reduce its debt service, and may explore other liquidity options, including a major investment or a sale as a going concern.

---

[1] Simultaneously with this Motion, the Debtor also filed a Motion for Entry of an Order Enforcing the Automatic Stay, which seeks an order directing Utica and the Auctioneer to return possession of the Debtor's machinery and equipment and to remove any and all personnel from the Debtor's facilities.

B.  *Existing Secured Debt*[2]

    10.    The Debtor's assets are encumbered by obligations to the following creditors:

        **a. TD Bank.** TD Bank holds a claim against the Debtor in the approximate amount of $924,552.75, which is secured by a first position security interest in the Debtor's real estate and a second position security interest in the Debtor's personal property.

        **b. Utica Leaseco, LLC.** Utica Leaseco holds a claim against the Debtor in the approximate amount of $1.2 million, which is secured by a first priority security interest in certain designated machinery and equipment (the "Utica machinery and equipment"), a third priority security interest in all other personal property and a fourth priority security interest in the Debtor's real estate.

        **c. Diamond.** Diamond is owed approximately $1,335,163.68 by the Debtor, which indebtedness is secured by a first position security interest in all accounts receivable, inventory, and other personal property excepting only the Utica machinery and equipment, and a third position security interest in real estate and the Utica machinery and equipment.

        **d. U.S. Small Business Administration.** The Debtor owes the SBA approximately $1,331,193.21, which is secured by a second priority security interest in the Debtor's real estate.

        **e. Service Engineering, Inc.** Service Engineering has a mechanic's lien on SEI Job Number 27017/17338 Blow Feed System which secures indebtedness in the approximate amount of $10,954.23.

        **f. Town of Keene, NH.** The Debtor owes the Town of Keene approximately $394,323.73 in real estate taxes, which such indebtedness is secured by liens on the Debtor's real property.

        **g. State of New Hampshire Department of Employment Security.** The Department of Employment security is owed approximately $11,500, which indebtedness is allegedly secured by a lien upon all of the Debtor's personal property. That lien was perfected on September 13, 2011 and is likely avoidable.

    11.    A UCC search also revealed liens by Marmon/Keystone Corporation in certain specific inventory, but the Debtor's books do not show any debts owed to this particular creditor, and, upon information and belief, such UCC-1s should have been terminated.

---

[2] The debts described in this section are approximate, both in amount and in the scope of collateral. The Debtor reserves its right to challenge the claim amounts, and the extent, priority and validity of any alleged security interests, except to the extent such rights are waived with respect to Diamond in connection with court-approved debtor-in-possession financing.

C.  *The DIP Financing*

12. The Debtor reached an agreement pursuant to which Diamond will make available to the Debtor the DIP Financing. The terms and conditions of the DIP Financing are set forth in the Term Sheet and the existing loan and security documents attached collectively hereto as **Exhibit C** (the "Diamond Loan Documents").

13. The agreement is conditioned upon, *inter alia*, the entry of a final order approving the DIP Financing and the transactions contemplated by this Motion.

14. Pursuant to section 364(c)(2) and (3) of the Bankruptcy Code, indebtedness for the DIP Loan will be secured by continuing liens on all of the Debtor's pre-petition and post-petition assets, in the same priorities enjoyed by Diamond prepetition in the same assets (the "Diamond Collateral").

15. **Pursuant to Local Rule 4001-2(c), the Debtor hereby highlights that the proposed DIP Loan provides that the entirety of the obligations to Diamond will be secured by pre- and post-petition assets, given that Diamond was and is fully secured prepetition.**

## REQUEST FOR RELIEF

16. By this motion, the Debtor seeks authority to: (1) enter into the DIP Financing, as described above and outlined in greater detail in the Term Sheet; (2) grant Diamond a post-petition lien on all of its pre- and post-petition assets in the same priorities as Diamond enjoyed prepetition; (3) use cash collateral post-petition to the limited extent set forth below; and (4) grant adequate protection to the Lienholders in the form of replacement liens. The Debtor also seeks an order setting this matter for a final hearing.

## BASIS FOR RELIEF

*A.    Approval of the DIP Financing*

17.    The Debtor requires the proposed post-petition financing in order to rehire employees and purchase supplies necessary to restart its operations and meet other critical post-petition obligations in the ordinary course.  The proceeds of the DIP Financing will be used to pay the expenses set forth in the Budget, such as payroll, vendor and supplier costs, and other expenses necessary to restart and maintain operations.  Absent this relief, the Debtor will be forced to liquidate its assets quickly, to the substantial detriment of its creditors.  The DIP Financing is necessary to preserve, protect and maintain the going concern value of the Debtor's assets and maximize the value of its estate.

18.    The Debtor is unable to obtain unsecured credit sufficient to operate or reorganize its business by providing an administrative expense claim.  The DIP Financing was obtained on the most favorable terms available to the Debtor following discussions with various lending sources.  Under existing time constraints and conditions, and considering the limited available collateral of the Debtor, alternative financing was not and is not available at all, or on a timely basis.  The DIP Financing terms are reasonable in light of the risks involved and the collateral offered.

19.    Pending final hearing on the DIP Financing, the Debtor anticipates the need to borrow funds sufficient to cover expenses as set forth in the Budget.  These funds must be advanced from September 30, 2011 through October 21, 2011, and are necessary to avoid immediate and irreparable harm to the Debtor's estate.  Weekly payroll and certain critical expenses must be paid, and the Debtor will have insufficient funds to pay such payrolls and other critical expenses unless such advances are made.

20. By this Motion, the Debtor seeks authority, in essence, to continue its pre-bankruptcy credit relationship with Diamond. Section 364 permits the Court to authorize post-petition borrowing by a debtor in possession and provides that the Court may authorize the grant of security interests on property of the estate in connection with such borrowing. *See* 11 U.S.C. § 364(c). In addition, section 105 of the Bankruptcy Code authorizes the Court to issue any order that is necessary or appropriate to carry out the provisions of Title 11. *See* 11 U.S.C. § 105(a).

21. The proposed continuation of the Debtor's financing relationship with Diamond, on the terms set forth in the Diamond Loan Documents, is in the best interests of the Debtor's estate. The Debtor does not currently have an alternative source of working capital with which to continue its operations and to pay its ordinary course obligations, such as those owed to suppliers, employees, insurers, and taxing authorities. In order for the Debtor to continue operating its business during the case, the Debtor needs a source of working capital.

22. As adequate protection of its interests in property of the estate, the Debtor proposes to grant Diamond a security interest (the "<u>Diamond Replacement Lien</u>") in the items of collateral identified in the Diamond Loan Documents, with the Diamond Replacement Lien having the same priority as the security interests granted to Diamond by the Debtor prior to the Petition Date, and with the benefit of the intercreditor agreement and subordinations described in Paragraph 3 above. As noted above, the Debtor believes that Diamond possesses a first priority security interest in and lien on the Debtor's accounts receivable and inventory, and other junior liens, leaving Diamond fully secured. In addition, the Debtor proposes that, to the extent that Diamond has an allowable claim under 11 U.S.C. § 507(a)(2), then Diamond shall have a claim under 11 U.S.C. § 507(b) (the "<u>Diamond Superpriority Claim</u>"), which Diamond Superpriority

Claim would (i) have priority over all other claims entitled to priority under §507(a)(2), with the exception of quarterly fees due to the United States Trustee pursuant to 28 U.S.C. § 1930 and professional fees incurred by Debtors' professionals. Notwithstanding the foregoing: (i) the Diamond Replacement Lien and the Diamond Superpriority Claim would not attach to or be satisfied from any avoidance actions pursuant to Chapter 5 of the Bankruptcy Code or the proceeds thereof; and (ii) the Diamond Collateral, the Diamond Replacement Lien and the Diamond Superpriority Claim would be subject to a first priority professional fees and expenses carve-out for the benefit of the Debtor's professionals in the amount of $150,000 (the "Carve-Out"). The Carve-Out would secure the payment of such fees and expenses to the extent such fees and expenses, as allowed by the Bankruptcy Court, were not paid from any other source.

  B. *Use of Cash Collateral; Adequate Protection of Other Lienholders' Interests*

  23. As noted above, the Debtor's inventory and accounts receivable, including cash held in a certain lockbox (the "Lockbox") maintained at TD Bank and controlled by TD for the benefit of TD and Diamond, are subject to the purported liens of Diamond, TD Bank, Utica and the New Hampshire Department of Employment Security (collectively, the "Lienholders"). Accordingly, the proceeds of such collateral constitute the Lienholders' cash collateral under 11 U.S.C. § 363(a).

  24. Pursuant to section 363(c)(1) and (c)(2)(B) of the Bankruptcy Code, Bankruptcy Rule 4001(b), and Local Rule 4001-2, the Debtor seeks authority to use the amounts in its existing bank accounts, including the Lockbox, and cash generated post-petition (the "Cash Collateral") in the ordinary course of business, including payment of items shown in **Exhibit B**, consistent with the terms of the DIP Financing.

25. As adequate protection of the Lienholders' interests in the Cash Collateral, in light of the DIP Financing and the limited use of Cash Collateral, the Debtor seeks authority, pursuant to section 552(b)(1) of the Bankruptcy Code, to grant the Lienholders a continuing, post-petition interest in the Cash Collateral and the proceeds thereof, to the same nature, extent and priority as the pre-petition liens held by the Lienholders in the Debtor's inventory and accounts receivable, to the extent the Cash Collateral is used by the Debtor or the value of such Cash Collateral is otherwise diminished as a consequence of the pendency of this case and the automatic stay.

26. Under these circumstances, no party would be unfairly harmed by the grant of the relief sought hereby.

## NOTICE

27. Notice of the hearing on this Motion was served on the following parties on the date on which it was filed by e-mail or facsimile: (1) the United States Trustee; (2) the Debtor's secured creditors or their counsel; (3) the non-insider holders of the twenty (20) largest unsecured claims against the Debtors or their counsel; and (4) applicable federal and state taxing authorities.

WHEREFORE, the Debtor respectfully requests that this Court enter an order: (1) authorizing the Debtor, on an interim basis up to and through October 21, 2011, to incur indebtedness to Diamond on the terms set forth in **Exhibits A and C**; (2) authorizing the Debtor to grant Diamond a post-petition lien on the Collateral, as well as the Diamond Replacement Lien and the Diamond Superpriority Claim, subject to the conditions stated above; (3) authorizing the use of proceeds of the DIP Financing and Cash Collateral in the amounts and for the purposes set forth in **Exhibit B**; (4) granting the Lienholders replacement liens in the Cash

Collateral on the terms set forth herein; (5) setting a date and time for a final hearing on the relief requested in this Motion; and (6) granting such other and further relief as this Court deems necessary and appropriate.

Dated: September 30, 2011    KINGSBURY CORPORATION

By its proposed attorneys:


/s/ *Jennifer Rood*
Jennifer Rood, Esq.
BERNSTEIN, SHUR, SAWYER & NELSON
Jefferson Mill Building
670 North Commercial Street, Suite 108
PO Box 1120
Manchester, NH 03105-1120
(603) 623-8700

and


/s/ *Robert J. Keach*
Robert J. Keach, Esq.
Jessica A. Lewis, Esq.
Máire B. Corcoran, Esq.
BERNSTEIN, SHUR, SAWYER & NELSON
100 Middle St., PO Box 9729
Portland, Maine 04104-5029
(207) 774-1200