UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW HAMPSHIRE

In re:

KINGSBURY CORPORATION,

Debtor.

Chapter 11

Case No. 11-13671

## AFFIDAVIT OF IRIS A. MITROPOULIS IN SUPPORT OF FIRST DAY MOTIONS

I, IRIS A. MITROPOULIS, being duly sworn, depose and say:

1. I am the sole director and president of Kingsbury Corporation (the "Debtor"). I am also a member of Ventura Industries, LLC ("Ventura"), with a 96% ownership interest in that entity. Ventura is the sole shareholder of Donson Group, Ltd. ("Donson"), which is the sole shareholder of the Debtor. Ventura's only asset is its ownership interest in Donson and Donson's only asset is its ownership interest in Ventura.[1]

2. On September 30, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Hampshire. The same day, the following motions were filed on behalf of the Debtor (collectively, the "First Day Motions"): (1) Motion for Order: (A) Authorizing the Debtor to Obtain Post-Petition Financing; (B) Granting to Diamond Business Creditor, LLC Post-Petition Security Interests; (C) Authorizing the Use of Cash Collateral; (D) Granting Adequate Protection in the Form of Replacement Liens; and (E) Setting a Final Hearing (the "Motion to Borrow"); (2) Motion for Entry of an Order Enforcing the Automatic Stay (the "Stay Motion"); (3) Motion for Entry of an Order Authorizing Debtor to Pay Prepetition Claims of Certain Critical Vendors and Approving Procedures Related

---

[1] Ventura and Donson shall be collectively referred to herein as the "Holding Companies."

Thereto (the "Critical Vendor Motion"); (4) Motion for Authority to Pay Prepetition Employee Wages, Salaries and Related Items; To Make Payments for Which Payroll Deductions are Made; and to Make Insurance Payments (the "Payroll Motion"); (5) Motion for Approval to Use Cash Management System and for Authorization to Use Prepetition Bank Accounts and Business Forms (the "Cash Management Motion"); (6) Motion for an Order Directing Joint Administration of Debtors' Chapter 11 Cases (the "Joint Administration Motion"); (7) Motion for Order, Pursuant to Rule 1007(c) of the Federal Rules of Bankruptcy Procedure, Extending Time to File Schedules and Statement of Financial Affairs (the "Schedules Motion"); and (8) Motion to Expedite Hearing with Respect to Certain First Day Motions (the "Motion to Expedite"). This Affidavit is submitted in support of these First Day Motions, which are described in greater detail below.

3. All facts set forth herein are based on my personal knowledge, on information supplied to me by others within the Debtor's organization, upon my review of relevant documents, or on my opinion based upon my experience and knowledge of the Debtor's operations, financial condition and present liquidity needs. If I were called to testify, I could and would testify competently to the facts set forth herein.

4. Part I of this Affidavit describes the business operations and background of the Debtor, and Part II sets forth facts relevant to each of the First Day Motions.

I. **Description of Debtor's Business and Background**

5. The Debtor's company has been in existence in one form or another since 1875, when David Piper founded a sewing machine and clothes wringer manufacturing and repair company in Keene, New Hampshire. Piper eventually joined James S. Wilkins, Jr. to form the Triumph Wringer Company which, in addition to manufacturing and repairing sewing machines,

began producing a number of cast iron toys. In 1890, the Triumph Wringer Company spun off its toy manufacturing operations and Wilkins founded the Wilkins Toy Company.

6. The Wilkins Toy Company became known for its exquisitely detailed cast iron toys. In an effort to increase both the quality and selection of toys offered by the company, Harry Thayer Kingsbury – who purchased the Wilkins Toy company in 1894 – began designing and building manufacturing equipment. In 1916, Kingsbury's eldest son, Edward, graduated from the Massachusetts Institute of Technology and joined the company, eventually designing the Drive Drilling Machine, which was perfected in 1918. That same year, the Wilkins Toy Company changed its name to the Kingsbury Manufacturing Corporation.

7. Under Edward Kingsbury's direction, the manufacture of drilling machines grew steadily until, in 1928, the Kingsbury Machine Tool Corporation was formed. During the First and Second World Wars, the Kingsbury Machine Tool Corporation's operations were largely devoted to the design and production of machines used to manufacture parts necessary for the country's military buildup. Those operations eventually took over the toy company's facilities as well. In 1944, the company sold all of its toy-making equipment and focused exclusively on the design and manufacture of machinery and equipment.

8. Eventually the Kingsbury Machine Tool Corporation became the Kingsbury Corporation. Today, the Debtor is a recognized leader in the design and manufacture of premier, quality, special purpose, high production metal cutting, assembly equipment, turning, and machining centers. In the last fifteen years, Debtor has sold over $145,000,000 of machine systems to Chrysler Group, LLC ("Chrysler"), Ford Motor Company and General Motors Corporation alone, and an additional $50,000,000 to tiered suppliers to the Big Three. The Debtor operates in a 300,000 square foot facility located in Keene, New Hampshire, which

includes extensive high-bay assembly areas and state-of-the-art manufacturing capabilities. Parts machined and designed by the Debtor are used in everything from home appliances, to automobiles and jets.

9. The Debtor's current owner bought the company in 1998 and its primary secured creditors are TD Bank, N.A. ("TD Bank"), the U.S. Small Business Administration (the "SBA"), Utica Leaseco, LLC ("Utica") and Diamond Business Credit, LLC ("Diamond"). TD Bank, Diamond and Utica have blanket liens on substantially all of the Debtor's property but, by virtue of an Intercreditor Agreement dated April 24, 2009, TD Bank has a first position on the Debtor's real estate, Utica is in first on certain machinery and equipment and Diamond has a first priority lien on personal property other than that machinery and equipment which is Utica's collateral.

10. The Debtor's operations were generally profitable until early 2009, when the collapse of the United States auto industry, coupled with generally recessionary economic conditions, resulted in declining orders and the cancellation of several major manufacturing programs. By March 2009, the Debtor was forced to furlough many of its employees and to freeze payments to vendors. Given the nature of the Debtor's operations, it was difficult to reduce overhead rapidly enough to match declining business revenues. The Debtor's major lenders showed temporary patience, but by early 2011, the Debtor faced increasing pressure, particularly from Utica, its major equipment lender. Observing apparent economic recovery in other sectors of the auto industry, Utica did not understand that manufacturers of custom machinery such as the Debtor would experience recovery on a somewhat more delayed basis. In the last six months, the Debtor has received requests for quotes from a dozen or so customers for machine systems ranging in price from $1,000,000 to over $5,000,000.

11. The Utica debt arises out of a March 14, 2008 Loan and Security Agreement pursuant to which Utica advanced $1,525,000 to the Debtor. On July 8, 2011, Utica sent a notice of default alleging that the Debtor was in default under the terms of the loan agreement and accelerating the debt so that principal, interest and late charges in the amount of $1,257,819.14 allegedly became due on July 14, 2011.

12. On or about July 13, 2011, Utica and the Debtor entered into a Surrender and Forbearance Agreement, an Auction Agreement and an Occupancy Agreement (collectively, the "Surrender and Auction Agreements"). Under the terms of the Surrender and Forbearance Agreement, the Debtor allegedly surrendered to Utica possession of all of the machinery and equipment in which Utica has a first priority lien. The Surrender and Forbearance Agreement also proposed an alternative payment schedule on the promissory note underlying the loan agreement.

13. Under the terms of the Surrender and Forbearance Agreement, the auction would be terminated if the Debtor paid Utica $100,000 plus certain expenses ("Payment One"), on or before August 22, 2011. After that date, the Debtor could stop the auction any time up until the day before the auction by paying the full liability owed to Utica and a termination fee to the Maynards Industries (1991), Inc. ("Maynards"), the auctioneer designated under the Surrender and Auction Agreements, which increased approximately every two weeks by $50,000.

14. Shortly after August 22, 2011, Utica's president informed the Debtor that it was still willing to terminate the auction if the Debtor paid Utica Payment One and Maynards' auction fees due under the Surrender and Auction Agreements. On September 14, 2011, Utica told the Debtor that the amount Utica needed to receive on or before September 19, 2011 to stop the auction was $300,000; comprised of Payment One, the auction termination fee, and the

5

auction expenses. Utica knew that the Debtor intended to raise the $300,000 by entering into a licensing agreement as described below.

15. On the morning of September 16, 2011, Utica informed the Debtor that it should plan on paying $332,000, not $300,000 because the auction fees were probably higher than previously estimated. The Debtor told Utica that $300,000 was all it would be able to pay, which was the amount that Utica had instructed the Debtor to raise. When the Debtor reviewed the Surrender and Auction Agreement and discovered that Maynards is only entitled to a termination fee, not a termination fee plus expenses, the Debtor informed Utica that $300,000 would not only be enough to cover Payment One and the auction termination fee, it would also be enough to prepay the second payment required under the Surrender and Forbearance Agreement ("Payment Two"). Utica refused to accept anything less than the requested $332,000, and also stated that the Debtor would need to make Payment Two and a third payment under the Surrender and Forbearance Agreement if it wanted to avoid the auction.

16. The Debtor was unable to meet Utica's demands. As of the Petition Date, the Debtor had ceased operating and Maynards was on site to inventory and prepare machinery and equipment for sale at an auction scheduled to take place on or about October 11, 2011. The Debtor proceeded to file its chapter 11 petition with the intention of restructuring its debt and reorganizing its operations so it can emerge from chapter 11 as an operating entity, and to protect the interests of <u>all</u> of its secured and unsecured creditors, all of whose interests are damaged by Utica's auction.

17. Pre-petition, the Debtor and the two Holding Companies entered into an Intellectual Property License Agreement with Chrysler pursuant to which the Debtor granted Chrysler a license in all of the proprietary information and intellectual property rights of the

Debtor with respect to certain machinery and equipment sold to Chrysler by the Debtor. In consideration, Chrysler paid $300,000, which will be paid to Diamond (as the holder of a security interest in intellectual property), and which will support debtor in possession financing from Diamond, to jumpstart operations and fund the chapter 11 case.

## II. The First Day Motions

18. I have reviewed each of the First Day Motions, including the exhibits thereto, and I believe that the relief sought in each of the motions is necessary if the Debtor is to operate in chapter 11 with a minimum of disruption. Ultimately, those motions will be critical to the Debtor's ability to achieve a successful reorganization.

*A.    Motion to Borrow*

19. The Motion to Borrow seeks an order: (a) authorizing the Debtor to obtain post-petition financing from Diamond in the form of an increase in the inventory advance rate to 35% with such inventory loan advance not to exceed $300,000.00, in addition to the Debtor's prepetition revolving line of credit with Diamond, in accordance with the term sheet attached to the Motion to Borrow as <u>Exhibit A</u> (the "<u>Term Sheet</u>") and the amendments to existing loan and collateral documents referenced therein (the "<u>Amendment</u>") (such financing being referred to herein as the "<u>DIP Financing</u>"); (b) authorizing the Debtor to grant to Diamond post-petition security interests in all of its assets in the same priorities as Diamond enjoyed with respect to all of such assets prepetition (and without priming any other existing liens); (c) authorizing the use of cash collateral post-petition for the purposes set forth in the budget (the "<u>Budget</u>") attached to the Motion to Borrow as <u>Exhibit B</u>; (d) granting adequate protection to certain lienholders with a security interest in the cash collateral in the form of replacement liens; and (e) prescribing the manner of notice for the final hearing.

20. The Debtor requires the proposed post-petition financing in order to rehire employees and purchase supplies necessary to restart its operations and meet other critical post-petition obligations in the ordinary course. The proceeds of the DIP Financing will be used to pay the expenses set forth in the Budget, such as payroll, vendor and supplier costs, and other expenses necessary to restart and maintain operations. Absent this relief, the Debtor will be forced to liquidate its assets quickly, to the great detriment of its creditors. The financing is necessary to preserve, protect and maintain the going concern value of the Debtor's assets and maximize the value of its estate.

21. The Debtor is unable to obtain unsecured credit sufficient to operate or reorganize its business by providing an administrative expense claim. The DIP Financing was obtained on the most favorable terms available to the Debtor following discussions with various lending sources. Under existing time constraints and conditions, and considering the limited available collateral of the Debtor, alternative financing was not and is not available at all, or on a timely basis. The financing terms are reasonable in light of the risks involved and the collateral offered.

22. Through the Motion to Borrow, the Debtor seeks authority, in essence, to continue its pre-bankruptcy credit relationship with Diamond. The proposed continuance of the Debtor's relationship with Diamond, on the terms set forth in the Diamond Loan Documents is in the best interests of the Debtor's estate. The Debtor does not currently have an alternative source of working capital with which to continue its operations and to pay its ordinary course obligations, such as those owed to suppliers, employees, insurers, and taxing authorities. In order for the Debtor to continue operating its business during the case, the Debtor needs a source of working capital.

23. The Debtor believes that Diamond possesses a first priority security interest in

and lien on the Debtor's accounts and inventory and intellectual property, and other junior liens, leaving Diamond fully secured. As adequate protection of its interests in property of the estate, the Debtor proposes to grant Diamond a security interest (the "Diamond Replacement Lien") in the items of collateral identified in the Diamond Loan Documents, with the Diamond Replacement Lien having the same priority as the security interests granted to Diamond by the Debtor prior to the Petition Date, and with the benefit of the intercreditor agreement and subordinations described above.

24. The Debtor's inventory and accounts receivable, and any cash held in a certain lockbox (the "Lockbox") maintained at TD Bank and for the benefit of Diamond and TD Bank, as such collateral existed on the Petition Date, are subject to the purported liens of Diamond, TD Bank, Utica and the New Hampshire Department of Employment Security (collectively, the "Lienholders"). The Debtor seeks authority to use any amounts in its existing bank accounts, including the Lockbox, and cash generated post-petition (the "Cash Collateral") in the ordinary course of business, including payment of items shown on the Budget, consistent with the terms of the DIP Financing.

25. As adequate protection of the Lienholders' interests in the Cash Collateral, the Debtor seeks authority to grant the Lienholders a continuing, post-petition interest in the Cash Collateral and the proceeds thereof, to the same nature, extent and priority as the pre-petition liens held by the Lienholders in the Debtor's inventory and accounts receivable, to the extent the Cash Collateral is used by the Debtor or the value of such Cash Collateral is otherwise diminished as a consequence of the pendency of these cases and the automatic stay.

26. Absent the relief sought in the Motion to Borrow, the Debtor will be unable to jumpstart its operations and will be forced to liquidate its assets quickly, to the great detriment of

the Debtor's estate and its creditors. The Debtors require total borrowing of $213,000 through October 21, 2011.

B. *Stay Motion*

27. As mentioned above and discussed in more detail in the Stay Motion itself, Utica and Maynards claim to be in possession of the Debtors' machinery and equipment (the "Equipment") pursuant to the Surrender and Auction Agreements. As of the Petition Date, personnel of Utica and/or Maynards were present at the Facility. The alleged "possession" of the Equipment by Utica, to which the Debtor still has title and which is therefore property of the estate, the prevention by Utica of use of the Equipment, and the presence of external personnel at the Facility have disrupted the Debtor's business operations and put the Debtor at serious risk of no longer being able to function as a going concern.

28. Continued possession by Utica and/or Maynards, and continued enforcement of the Forbearance Agreement by Utica, violates the automatic stay and threatens the Debtor's reorganization to the detriment of all other creditors of the estate, including other secured creditors.

C. *Critical Vendor Motion*

29. The Debtor's operations depend on goods supplied by certain vendors which are critical to its operations. A list of those vendors is attached to the Critical Vendor Motion as Exhibit A (the "Critical Vendors"). The Debtor is not able to compel the Critical Vendors to perform on a timely basis because no contractual relationship exists. Furthermore, the Debtor believes that, unlike other vendors who may be replaced without disruption to the business, the Critical Vendors would be replaceable only with extraordinary expense, significant delay, quality

issues and other detrimental effects – all of which would damage the value of the Debtor's going concern value.

30. Accordingly, the Debtor seeks an order authorizing, but not directing, the Debtor to pay prepetition claims of the Critical Vendors as identified on <u>Exhibit A</u> to the Critical Vendor Motion provided such vendors execute a letter substantially in the same form as the one attached to the Critical Vendor Motion as <u>Exhibit B</u> setting forth the conditions and terms of payment, or make arrangements otherwise satisfactory to the Debtor in the exercise of its business judgment.

31. The Debtor depends on timely delivery of the goods supplied by Critical Vendors to jumpstart its operations and transition seamlessly into post-petition operations. Absent this relief, the Debtor could suffer substantial delay in recommencing its operations, eventually leading to liquidation of its estate, to the great detriment of its creditors.

D. *Payroll Motion*

32. The Debtor seeks authority to pay certain liabilities which accrued prepetition for wages, salaries and payroll deductions. These liabilities, along with all costs incident to the foregoing payments, including payroll related taxes and reimbursements for employee expenses, are collectively referred to in the Payroll Motion as the "<u>Prepetition Compensation</u>."

33. The Debtor seeks authorization to make payments for Prepetition Compensation in the amounts set forth in the Payroll Motion and accrued during the following three prepetition periods: (1) that became due on July 15, 2011 and are owed for the payroll period beginning July 9, 2011 and ending July 15, 2011; (2) that became due on July 22, 2011 and are owed for the payroll period beginning July 16, 2011 and ending July 22, 2011; and (3) that became due on July 29, 2011 and are owed for the payroll period beginning July 23, 2011 and ending on July 29, 2011. The Debtor also seeks authorization to pay certain deductions owed in relation to the

payroll which was came due and was paid on September 30, 2011 and to reimburse certain expenses which were incurred by the Debtor's employees prepetition.

34. The Debtor seeks this relief because any further delay in paying the Prepetition Compensation will damage the Debtor's relations with its employees and will irreparably harm morale. To maintain and preserve the morale of its continuing labor force, and to further its goal of recommencing operations, it is essential that the Debtor be permitted to pay its employees the compensation and deductions accrued prior to the filing. Absent the relief requested by this motion, employees will suffer undue hardship and, in many instances, suffer financial difficulties because these sums are needed to enable them to meet their own personal obligations.

35. No employee will receive, in the aggregate, more than the $11,725 priority amounts allowed under 11 U.S.C. § 507(a)(4) and (5).

36. In addition to the Prepetition Compensation, the Debtor seeks authority to pay certain insurance premiums to the insurers and in the amounts listed in the Payroll Motion. In most cases, payment of these premiums is necessary to avoid termination of insurance policies and unnecessary risk to the Debtor and its estate.

37. Three of the policies have already been terminated. The Debtor seeks authority to pay the prepetition balance owed on those policies in order to secure reinstatement. The cancellation of these policies had a direct and negative impact on the Debtor's trained workforce and the Debtor is at risk of losing some employees if the policies are not reinstated.

38. Accordingly, payment of the Prepetition Compensation and insurance premiums are necessary in order to maintain and preserve the value of the Debtor's estate.

### E. Cash Management Motion

39. The Debtor operates a cash management system (the "Cash Management System") that enables the Debtor to collect and disburse cash in an efficient manner. The Cash Management System consists of three accounts (the "Accounts") that facilitate the timely and efficient collection, concentration, management and disbursement of funds by the Debtor.

40. The Debtor's primary bank account is a lockbox (the "Lockbox") which is maintained at TD Bank for the benefit of TD and Diamond. The Debtors' customers are directed to send receivables directly to the Lockbox and all other funds received by the Debtor are deposited into the same account.

41. The Debtor also maintains an operating account at Cheshire County Federal Credit Union (the "Operating Account") and a payroll account at Connecticut River Bank, N.A. (the "Payroll Account"). The Debtor carries little or no balance in either of these accounts. When the Debtor requires cash to pay payroll or other expenses, the Debtor submits a loan authorization request to Diamond for funds to be released in an amount necessary to cover the specified expenditures. Diamond then instructs TD Bank to deposit funds into either the Operating Account or the Payroll Account as appropriate.

42. The Lockbox is a necessary condition to the Debtor's financing arrangement with Diamond and closing that account would jeopardize the Debtor's relationship with that creditor at a time when the Debtor is negotiating postpetition financing with Diamond. Furthermore, if the Lockbox account is closed, the Debtor will need to provide each of its customers with new payment instructions. Any new remittance procedure may lead to confusion and delay in receiving payments and could be detrimental to its business operations going forward.

43. The current Cash Management System allows for a fluid transfer of funds from the Lockbox to the Payroll and Operating Accounts as necessary and enables the Debtor to meet obligations such as payroll in a timely fashion. Closing the Payroll and Operating Accounts would cause unnecessary time, expense and effort with no benefit to the Debtor's estates. The Debtors do not carry a balance in either of these accounts and, therefore, account records regarding deposits and withdrawals will clearly and necessarily delineate between pre- and post-petition proceeds.

44. Transitioning to a new cash management system would cause the Debtor to incur additional costs and deplete assets of the estate without providing any benefit to the Debtor's creditors. Under the circumstances, the maintenance of the Cash Management System is both essential to the Debtor's business and in the best interests of the Debtor's estate.

*F.   Joint Administration Motion*

45. As is evident from the recitation of facts, the Debtor and the Holding Companies are three separate but related entities. In fact, Ventura's sole asset is its 100% ownership interest in Donson and Donson's sole asset is its 100% ownership interest in the Debtor.

46. Although the Holding Companies do not have any liabilities of their own, they did guarantee certain of the Debtor's liabilities and, therefore, overlapping claims may be filed in the three cases. Moreover, creditors of the Holding Companies will be interested in developments in the Debtor's case and vice versa.

47. Joint administration of the cases of the Debtor and the Holding Companies, including the use of a single pleadings docket, the combining of notices to creditors of different estates, and the joint handling of purely administrative matters, will aid in expediting these cases and render the bankruptcy process less costly for each of the estates.

48. The rights of the respective creditors of the Debtors will not be adversely affected by the proposed joint administration of these cases, since the relief is solely for administrative convenience and will not affect any substantive rights.

G. *Schedules Motion*

49. The Debtor has been under significant financial distress for a long time and is not currently operating. In the early stages of this case, the Debtor will be focused on resuming operations with a depleted workforce while trying to meet its early obligations as a fiduciary to its estate. It will take significant time, effort and resources for the Debtor to ramp up production as it rehires employees, obtains necessary supplies and processes orders. At the time same time, the Debtor and the Holding Companies will be negotiating with their creditors and restructuring their respective debts so that they can maintain their relationships with their clientele and continue to operate as a going concern.

50. The Debtor and the Holding Companies have limited management and administrative and financial staff, and these resources will be consumed by the day-to-day operations of the Debtor's business and carrying out the duties of the Debtor and the Holding Companies as debtors in possession. Accordingly, an extension of the time within which to file the Schedules is required to ensure minimal disruption to the Debtor's operations and to ensure that the Debtor and the Holding Companies can successfully reorganize.

H. *Motion to Expedite*

51. The Debtor requires immediate relief on the motions discussed above in order to facilitate a smooth transition into chapter 11 and to enable the Debtor's officers and administration to focus on immediate challenges in the early stages of these chapter 11 cases. Accordingly, the Debtors are seeking an expedited hearing on the First Day Motions.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: September 29, 2011

_/s/ Iris A. Mitropoulis_
Iris A. Mitropoulis